# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

STEPHANIE B. SULLIVAN                    CASE NO. 3:19-CV-0806

VERSUS                                   JUDGE TERRY A. DOUGHTY

ANDREW SAUL, COMMISSIONER, U.S.          MAG. JUDGE KAREN L. HAYES
SOCIAL SECURITY ADMINISTRATION

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.   The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).   For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

Stephanie Sullivan filed the instant applications for Title II disability insurance benefits and Title XVI supplemental security income payments on February 23, 2017.   (Tr. 20, 170-183).[1]   She alleged disability as of February 16, 2017, because of PTSD, chronic depression, heart disease, and back problems.   (Tr. 203, 207).   The state agency denied the claims at the initial stage of the administrative process.   (Tr. 56-83, 86-90).   Thereafter, Sullivan requested an April 26, 2018, hearing before an Administrative Law Judge ("ALJ").   (Tr. 36-55). However, in an August 2, 2018, written decision, the ALJ determined that Sullivan was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that she was able to return to make an adjustment to other work that exists in significant numbers

---

[1]  She filed a prior disability application on August 12, 2015, that was denied by an ALJ on February 10, 2017, and apparently not further appealed.   (Tr. 59).

in the national economy.   (Tr. 17-31).   Sullivan appealed the adverse decision to the Appeals

Council.   On April 29, 2019, however, the Appeals Council denied Sullivan's request for

review; thus the ALJ's decision became the final decision of the Commissioner.   (Tr. 1-3).

On June 25, 2019, Sullivan sought review before this court.   She asserts several

assignments of error, which may be recharacterized as follows:

1)      For various reasons, the ALJ's residual functional capacity assessment is not
        supported by substantial evidence; and

2)      The ALJ's step five finding was tainted by legal error because he failed to
        confirm that the vocational expert's testimony was consistent with the Dictionary
        of Occupational Titles as required by SSR 00-4p.

**<u>Standard of Review</u>**

This court's standard of review is (1) whether substantial evidence of record supports the

ALJ's determination, and (2) whether the decision comports with relevant legal standards.   *Villa*

*v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).   Where the Commissioner's decision is

supported by substantial evidence, the findings therein are conclusive and must be affirmed.

*Richardson v. Perales*, 402 U.S. 389, 390 (1971).   The Commissioner's decision is not

supported by substantial evidence when the decision is reached by applying improper legal

standards.   *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).   Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Richardson v. Perales*, 402 U.S. at 401.   Substantial evidence lies somewhere between a

scintilla and a preponderance.   *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).   A finding

of no substantial evidence is proper when no credible medical findings or evidence support the

ALJ's determination.   *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).   The reviewing

court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of

the

Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ."  42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1)    An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)    An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4)    If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

3

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled.   *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).   When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated.   *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).   If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis.   *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## **ALJ's Findings**

## I.      **Steps One, Two, and Three**

The ALJ determined at step one of the sequential evaluation process that the claimant had not engaged in substantial gainful activity since the alleged disability onset date.   (Tr. 22).   At step two, he found that the claimant suffers from severe impairments of asthma, valvular heart disease, tachyarrhythmia, residual effects from shoulder surgery, obesity, post-traumatic stress disorder, anxiety, and depression.   *Id.*   He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.   (Tr. 21-24).

## II.     **Residual Functional Capacity**

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform light work,[2] except that she should perform no over the shoulder work.   She

---

[2] Light work entails:

also needed to avoid concentrated exposure to heat, wetness, humidity, fumes, or hazards such as unprotected heights and dangerous machinery.    Finally, she could not perform complex work, and only occasionally interact with the general public.    (Tr. 24-29).

## III.    Steps Four and Five

At step four, the ALJ determined that the claimant was unable to perform any past relevant work.    (Tr. 29).    Accordingly, he proceeded to step five.    At this step, the ALJ determined that the claimant was a younger individual, with at least a high school education, and the ability to communicate in English.    *Id*.    Transferability of skills was not an issue.    *Id*.

The ALJ then observed that given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled.    20 C.F.R. § 404.1569; Rules 202.21, Table 2, Appendix 2, Subpart P, Regulations No. 4; Tr. 29-30.    However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent the additional limitations eroded the occupational base for light work.    *Id*. In response, the VE identified the representative jobs of photocopy machine operator, *Dictionary of Occupational Titles* ("DOT") Code # 207.685-014; and housekeeper/cleaner, DOT # 323.687-014, that were consistent with the ALJ's RFC and the claimant's vocational profile.    (Tr. 30, 52-

---

. . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.
20 C.F.R. § 404.1567(b).

53).[3]

## <u>Non-Exhaustive Chronology of Relevant Medical Evidence</u>

On February 22, 2016, plaintiff saw nurse practitioner Shane McVay, where she reported zero depression.   (Tr. 290-292).

On March 30, 2016, Sullivan saw Howard Murray, M.D., for follow-up for shortness of breath with exertion and crackles and wheezing.   (Tr. 279-281).   She denied painful joints or weakness.   *Id.*   Murray assessed Sullivan with dyspnea, asthma, GERD, valvular disease, wheezing, and obesity.   *Id.*

An April 25, 2016, echocardiogram showed normal LV dimensions and function with estimated EF greater than 60%, normal appearing left atrium and aortic root, suggestion of right ventricular enlargement, and a technically difficult study.   (Tr. 327-328).

On July 19, 2016, plaintiff was seen by nurse practitioner Shane McVay for anxiety disorder.   (Tr. 293-295).   She had three or more episodes of anxiety within a three-week period that interfered with her social activities.   *Id.*   She reported depression every day with loss of pleasure.   *Id.*   She had a normal range of motion in all extremities.   *Id.*   McVay diagnosed anxiety disorder, NOS.   *Id.*   He prescribed Xanax and Paxil.   *Id.*

On October 5, 2016, plaintiff returned to Shane McVay.   (Tr. 296-299).   Her chief complaint was difficulty sleeping.   *Id.*   She had not slept for the past three days.   *Id.*   She explained that her brain would not turn off.   *Id.*   She had a normal range of motion in all extremities.   *Id.*   McVay assessed essential hypertension, moderate recurrent major depression,

---

[3]  The VE responded that for the photo copy machine operator and housekeeper/cleaner jobs, there were 25,639 and 224,491 positions, respectively, available nationally.   (Tr. 52-53).   This incidence of work constitutes a significant number of jobs in the "national economy."   42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

6

persistent insomnia, and anxiety disorder, NOS.  *Id.*

Sullivan returned to Dr. Murray on November 2, 2016, for follow-up for shortness of breath, wheezing, and anxiety.  (Tr. 282-284).  She complained of wheezing while lying on her left side.  *Id.*  Sullivan admitted that her anxiety was controlled with Ambien.  *Id.*  She also had occasional edema in her legs.  *Id.*  She denied painful joints or weakness.  *Id.*

On November 9, 2016, Sullivan returned to McVay to have him complete disability paperwork.  (Tr. 300-302).  She had zero depression.  *Id.*  McVay diagnosed moderate, recurrent major depression, and anxiety disorder, NOS.  *Id.*

On February 15, 2017, Sullivan saw licensed professional counselor Michelle Dugas at Family Solutions Counseling.  (Tr. 352-353).  Sullivan again saw Michelle Dugas on February 22, 2017, whereupon she disclosed that her disability had been denied.  (Tr. 350-351).

Plaintiff returned to Dr. Murray on February 22, 2017 for her three-month follow-up. (Tr. 285-287).  She had been having some wheezing, but no GERD symptoms.  *Id.*  She denied nighttime symptoms.  *Id.*  She also denied any painful joints or weakness.  *Id.*  Murray diagnosed dyspnea, asthma, GERD, valvular disease, and wheezing.  *Id.*

Plaintiff returned to Family Solutions Counseling on March 1, 2017.  (Tr. 348-349). She was depressed and apprehensive.  *Id.*  Her bank card had been denied.  *Id.*  She could not file for disability for 60 days.  *Id.*

On March 15, 2017, Sullivan again saw Michelle Dugas at Family Solutions Counseling. (Tr. 344-345).  Her mood was depressed and anxious.  *Id.*  Her problem list included abandonment, abuse, "avoidant," boundaries, depression, grief, mood swings, obsessions, relationships, self-absorption, and self-esteem.  *Id.*

On March 20, 2017, plaintiff was seen at Family Solutions Counseling by psychiatrist, Edward Lynam, M.D.  (Tr. 342-343).  Lynam noted that, last year, Sullivan had tried to substitute Wellbutrin for her longstanding Paxil use, but she reacted poorly.  *Id.*  Thus, her nurse practitioner restarted Paxil, but also left her on Wellbutrin.  *Id.*  At first, she was doing better, but then her panic attacks began to increase.  *Id.*  Sullivan now had suffered 20 panic attacks in two weeks.  *Id.*  She also experienced considerable loss of energy.  *Id.*  Motivation and concentration were off.  *Id.*  She had severe OCD with highly time-consuming compulsive activities related to needing to pair things and checking.  *Id.*  According to Lynam, she "clearly" was markedly impaired from severe OCD, panic disorder, and treatment resistant depression with respect to her ability to attend to any work task, adaptation to any kind of changes at work, and ability to maintain emotional control at any work situation.  *Id.*  In short, she was functionally disabled.  *Id.*  Her family history was positive for severe depression and suicidal actions in close relatives.  *Id.*  She had a normal gait and station.  *Id.*  Her thought process was circumstantial, with poor concentration.  *Id.*  She had normal short and long-term memory, but trouble relating, secondary to poor concentration.  *Id.*  Her attention was inadequate.  *Id.*  Her perception was reality-based.  *Id.*  Her judgment was sound.  *Id.*  Lynam diagnosed major depression, recurring severe; panic disorder with agoraphobia; OCD severe; and pain syndrome.  *Id.*  She was to remain in psychotherapy.  *Id.*

Plaintiff next saw Dr. Lynam on April 3, 2017.  (Tr. 340-341).  Her presenting issue was obsessive compulsive symptoms.  *Id.*  She was very distressed about OCD symptoms and reclusive reactions to anxiety.  *Id.*  However, her Xanax medication was very good on 80 percent of days.  *Id.*  She still was very forgetful, however.  *Id.*  She had marked impairment in sustained attention.  *Id.*  She was incapable of working due to marked impairment from

8

depression and anxiety creating confusion with changes in routine or unexpected events. *Id.* Mental status examination showed that she was alert and fully oriented; cooperative and task-directed; language and communication abilities were impaired with reduced range of word selection; range of affect and moods were within context; perceptions were normal; memory function was very poor with repeating herself; free of psychosis and lethality; and insight and judgment remained normal. *Id.*

Lynam diagnosed major depression, moderate recurring; obsessive compulsive disorder, severe; pain disorder with agoraphobia; primary insomnia; and cognitive impairment secondary to medication. *Id.*

On April 4, 2017, plaintiff saw Michelle Dugas at Family Solutions Counseling. (Tr. 338-339). Sullivan was tapering off of her Wellbutrin and adding a new one. *Id.* Her OCD was still bad – "counting." *Id.* She also was still mourning the loss of a child. *Id.* Her attention was normal; she was oriented in all spheres. *Id.* Her judgment was fair; insight poor. *Id.*

On April 6, 2017, plaintiff saw nurse practitioner Brinton Fegley for complaints of heart palpitations four to five times per week and fluttering. (Tr. 318-320). She also complained of associated shortness of breath. *Id.* Fegley assessed palpitations, non-rheumatic pulmonary valve stenosis, presence of prosthetic heart valve, atrial septal defect, and family history of ischemic heart disease. *Id.*

Plaintiff's next appointment with Dr. Lynam was on May 3, 2017. (Tr. 333-334). She was very distressed about OCD symptoms and her reclusive reactions to anxiety. *Id.* Xanax was very good 60 percent of days. *Id.* Her insomnia had improved with Zolpidem. *Id.* She still was very forgetful and noted that her grandmother had Alzheimer's before her suicide. *Id.*

9

The foregoing had a major impact on Sullivan's ability to maintain hobbies at home because of marked impairment in sustained attention.   *Id.*   Indeed, her focus was difficult to maintain during psychotherapy, which required frequent redirection.   *Id.*   Lynam did not believe that Sullivan was capable of working because of marked impairment from depression and anxiety creating confusion with changes in routine or unexpected events.   *Id.*   In addition, her shoulder pain had worsened with the weather change.   *Id.*   She was on a heart monitor for her frequent palpitations.   *Id.*   Mental status examination showed that she was alert and fully oriented; cooperative and task-directed; language and communication abilities were impaired with reduced range of word selection; range of affect and moods were within context; perceptions were normal; memory function was very poor with repeating herself; free of psychosis and lethality; and insight and judgment remained normal.   *Id.*

Lynam diagnosed Sullivan with major depression, moderate recurring; obsessive compulsive disorder, severe; pain disorder with agoraphobia; primary insomnia; and cognitive impairment secondary to medication.   *Id.*

Sullivan returned to Family Solutions Counseling on May 9, 2017.   (Tr. 331-332).   Her chief concern was her mood state.   *Id.*   She reported that she was depressed and anxious.   *Id.*   She also felt overwhelmed.   *Id.*   Her social activity was rare.   *Id.*   Her attention was normal.   *Id.*   She was downcast, with appropriate affect.   *Id.*   She mumbled and was preoccupied with guilt.   *Id.*   Her intelligence was average, her judgment was fair, and her insight was poor.   *Id.*   Goals were to reduce grief with positive self-care.   *Id.*   Her progress was mild.   *Id.*

10

On May 17, 2017, Edward Lynam, M.D., wrote a To Whom it May Concern letter in which he stated that he treated Sullivan for recurrent major depression, obsessive compulsive disorder, panic disorder with agoraphobia, primary insomnia, PTSD, and cognitive disorder secondary to chronic poly-pharmacy and multiple medical problems.    (Tr. 360-365). Furthermore, Sullivan had a history of cardiac surgeries with complications, permanent right shoulder injury with chronic pain and limited range of motion, sleep apnea syndrome, chronic asthma, multiple environmental allergies, scoliosis, and palpitations.    *Id.*    She demonstrated marked impairment in her ability to:    maintain focus to task, manage her emotions, and reliably remember salient details.    *Id.*    She would be unable to successfully interview for a job.    *Id.* She also would be unable to perform any job in the competitive marketplace with her current combination of impairments.    *Id.*    Potentially, she could improve incrementally over the next three years -- if treatment and luck were on her side.    *Id.*

On June 1, 2017, licensed professional counselor, Michelle Dugas completed an attorney-supplied medical statement concerning depression with anxiety, OCD, PTSD, or panic disorder. (Tr. 366-369).    She indicated, *inter alia*, that plaintiff's psychiatric conditions extremely limited her activities of daily living and caused extreme difficulties in maintaining social functioning. *Id.*    She had deficiencies in concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner.    *Id.*    Dugas opined that Sullivan was able to function independently outside the area of her home despite her panic attacks.    *Id.*    However, she further indicated that Sullivan was extremely impaired in her ability to:    maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and to be punctual, work in coordination with, and in proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions

11

from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods.  *Id.*  Sullivan also was markedly limited in several other areas of functioning.  *Id.*

On June 5, 2017, Dr. Lynam completed an attorney-supplied medical statement concerning depression with anxiety, OCD, PTSD or panic disorder.  (Tr. 362, 370-373).  He indicated that Sullivan had marked limitations in activities of daily living and maintaining social functioning.  *Id.*  She also had repeated episodes of deterioration or decompensation in work or work-like settings.  *Id.*  Furthermore, she was unable to function independently outside of the home because of panic attacks.  *Id.*  Lynam indicated that Sullivan was marked or extremely impaired in every area of functioning.  *Id.*  He explained that these marked to extreme impairments persisted despite four psychotropic medications, psychological therapy, and good social support at home.  *Id.*  Sullivan's many co-morbid medical problems exacerbated her symptoms and were chronic and intractable.  *Id.*  Progress was poor for medium or long-term recovery.  *Id.*

On July 12, 2017, plaintiff returned to Dr. Murray for her three to four-month follow-up. (Tr. 375-376).  She complained of shortness of breath with associated wheezing that was present night and day.  *Id.*  She had been using ProAir on a regular basis, but its effect was short-lived. *Id.*  Murray assessed dyspnea, asthma, GERD, valvular disease, wheezing, and tachyarrhythmia. *Id.*

Following a several month hiatus, Sullivan returned to Family Solutions Counseling on November 7, 2017, where she was seen by Ida Chauvin, Ph.D.  (Tr. 400-401).  She was depressed.  *Id.*  Sullivan stated that she went to pain management monthly in Monroe.  *Id.* She felt that her father disrespected her.  *Id.*  She refused to accept that others' pain could be as

12

great as hers.   *Id.*   She wanted others to acknowledge how great her suffering was.   *Id.*
Sullivan was emotional and resistant to the provider's suggestions.   *Id.*

On November 13, 2017, plaintiff returned to Dr. Lynam.   (Tr. 398-399).   Sullivan was
regressing with worsening of the intensity of her OCD symptoms.   *Id.*   She had difficulty
affording medication and was using opioids and benzodiazepines less.   *Id.*   Her depression was
regressing despite use of Paxil.   *Id.*   She used Ambien for insomnia.   *Id.*   She took Xanax as
needed, every day.   *Id.*   Her appetite was worse, and sleeping was worse despite Ambien.   *Id*.
She clearly was more impaired.   *Id.*   She was on Lisinopril for heart disease, Moban and
Neurontin for pain; Narco for breakthrough pain.   *Id.* She was having more joint pain.   *Id.*
Mental status examination showed that she was alert and fully oriented; cooperative and task-
directed; language and communication abilities were impaired with reduced range of word
selection; range of affect and moods were within context; perceptions were normal; memory
function was very poor with repeating herself; free of psychosis and lethality; and insight and
judgment remained normal.

Lynam diagnosed major depressive disorder, moderate recurring; OCD, severe; panic
disorder with agoraphobia, primary insomnia, cognitive impairment secondary to medication;
tachycardia, arrhythmia, asthma, allergies, joint pain, orthopedic problems.   *Id*.   He opined that
Sullivan was markedly impaired from a cognitive and emotional perspective; she was unable to
work in competitive job market.   *Id.*

On November 30, 2017, plaintiff saw nurse practitioner Shane McVay for her yearly
checkup.   (Tr. 405-408).   She had no chest pain, discomfort, palpitations, or dyspnea.   *Id.*   She
had muscle aches and arthralgias, however.   *Id.*   She vaped every day.   *Id.*   She had normal
movement of all extremities.   *Id.*   There was no disability or impairment noted on evaluation.

13

*Id.* McVay assessed her with essential hypertension, arthralgias in multiple sites; and fatigue. *Id.* He ordered x-rays of her hands. *Id.*

Sullivan returned to Dr. Lynam on March 12, 2018, where he noted that she was markedly and constantly impaired by low energy, poor focus, pain syndrome, severe anxiety of panic type, and trouble concentrating with memory on a daily basis. (Tr. 416-417). Her depression remained severe despite use of Paxil with Mirtazapine augmentation. *Id.* Ambien was not required for insomnia since augmentation. *Id.* She sometimes needed two Xanax per day. *Id.* Her appetite was poor. *Id.* She was markedly impaired in her activities of daily living. *Id.* Sullivan's arthritis was treated with prednisone, which helped the condition somewhat, but exacerbated her mood disorder symptoms. *Id.* Lynam opined that plaintiff remained markedly impaired with cognitive functioning, management of anxiety in social situations, and ability to adapt to changes or crises. *Id.* This chronic and persistent pattern of disorders rendered her unable to consider a return to competitive employment. *Id.* Her mental status examination and diagnoses remained largely unchanged. *Id.*

<u>**Analysis**</u>

**I.      RFC**

In his decision, the ALJ reviewed the available evidence, including the hearing testimony, plaintiff's activities of daily living, available treatment records, the impressions of plaintiff's treating healthcare providers, and the assessment of the non-examining agency physician and psychologist. (Tr. 24-29). In deriving plaintiff's RFC, the ALJ resolved the opinion evidence by assigning "little" weight to the impressions of plaintiff's treating mental health providers, i.e., her psychiatrist, Dr. Lynam, plus her counselor, Michelle Dugas, and instead, according "significant" weight to the findings of the non-examining agency physician

14

and psychologist:   Charles Lee, M.D., and Lynette Causey, Ph.D.   *Id.*   Plaintiff contends, *inter alia*, that the ALJ failed to provide good cause for discounting the opinions of her treating providers.   The court agrees.

Ordinarily, a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence."   20 C.F.R. § 404.1527(c)(2).   "[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."   *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted).   However, an ALJ cannot reject a medical opinion without an explanation supported by good cause.   *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

Here, the ALJ endeavored to discount the opinions of plaintiff's treating mental health providers by citing instances from her treatment records for her physical impairments where those providers documented that she was in no acute distress, with appropriate mood and affect, etc.   *See* Tr. 26-27.   However, if such a cursory review of a patent's mental health status by a provider who primarily was treating plaintiff's physical impairments were accorded dispositive effect, then there would be little or no reason to ever require a mental health consultation.

The ALJ also purported to discount the memory and concentration limitations recognized by Dr. Lynam and Michelle Dugas because plaintiff was able to attend medical appointments and relate her medical history.   (Tr. 27).   However, these providers undoubtedly were aware of plaintiff's ability to do these things, but nonetheless opined that she had marked and extreme limitations of functioning.

Similarly, the ALJ noted that plaintiff could handle money, work on puzzles, watch

15

television, and color, which presumably meant that she could maintain attention.   (Tr. 27).

Again, however, if such lay observations were all that it took to assess the effects of mental

impairments, then mental health examinations by specialists would prove superfluous and

meaningless.    The court emphasizes that this is not the case where the record contains

competing impressions by examining mental health providers, and the ALJ merely is bolstering

his decision to credit the opinion of one examining provider over that of another.   *See*

discussion, *infra*.

The ALJ further discounted Dr. Lynam's finding that plaintiff suffered cognitive

impairment, secondary to medication, on the basis that it was not supported by the record.   (Tr.

27).   However, plaintiff had a rather extensive medication list, including Lortab.   *See* Tr. 210.

Moreover, she went to pain management on a monthly basis.   *See* Tr. 400-401.[4]

The ALJ also purported to undermine the severity of plaintiff's mental impairment

limitations by citing a six-month gap in her mental health treatment records, while she still

sought treatment for her physical impairments.   (Tr. 27).   However, the court discerns only one

visit to her pulmonologist during this period.   Moreover, when plaintiff resumed mental health

treatment in November 2017, she disclosed that she had been having difficulty affording

medication.   (Tr. 398-399).   Certainly, if she was experiencing financial difficulties, that might

help explain the gap in treatment.

As further noted by plaintiff, "*absent reliable medical evidence from a treating or

examining physician controverting the claimant's treating specialist*, an ALJ may reject the

opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating

---

[4] For an unknown reason, plaintiff's treatment notes from Dr. Ledbetter at Louisiana Pain Care do not appear in the record.   *See* Tr. 210, 215.

physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000) (emphasis added). In this case, there was no other evidence from a treating or examining psychiatrist/psychologist that controverted the impressions of plaintiff's treating mental health providers. Therefore, the ALJ was obliged to address each of the § 404.1527(d)(2) (now § 404.1527(c)) factors.[5] This, he did not do.

In lieu of plaintiff's treating mental health providers, the ALJ favored the May 3, 2017, impression of the non-examining agency psychologist, Dr. Causey. (Tr. 67-68). It is manifest, however, that an opinion from a non-examining provider does not provide good cause for an ALJ to discount the findings of an examining provider. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) (addressing ALJ's reliance upon non-examining physician's opinion to discount findings of treating physician). The Fifth Circuit cited *Lamb* for the proposition that the reports of non-examining physicians do not provide substantial evidence when the non-examining physician's medical conclusions "contradict or are unsupported by findings made by an examining physician." *Villa v. Sullivan,* 895 F.2d 1019,1024 (5th Cir. 1990) (citing, *Lamb, supra*; and *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980)).

Further, as emphasized by plaintiff, the non-examining agency psychologist and physician relied on medical records that pre-date the relevant period and do not even appear in this administrative record. Moreover, Dr. Causey noted that there was no evidence of any current treatment by a mental health practitioner. (Tr. 63). She also remarked that mental status examination was within normal limits, with no signs of any acute psychopathology. *Id*. However, by the time of the ALJ's decision, the foregoing foundations for Dr. Causey's opinion

---

[5] Although § 404.1527(c) was amended, the changes do not apply to claims filed before March 27, 2017.

were no longer correct.

In sum, the ALJ grounded his RFC regarding the effects of plaintiff's mental impairments on the opinion of the non-examining agency psychologist.   However, that opinion was outdated, and the records upon which it was premised do not appear in the record.   The ALJ also provided insufficient reasons for discounting the opinions of plaintiff's treating mental health providers, and did not address all of the § 1527(c) considerations.   Finally, even if he had properly discounted the opinions of these providers, the remaining record is devoid of a valid medical source statement that parallels the ALJ's RFC.   Moreover, plaintiff's own testimony was not consistent with the ALJ's RFC.   (Tr. 47-50).   Under these circumstances, the court is compelled to find that the ALJ's assessment is not supported by substantial evidence.   *See Williams v. Astrue*, 2009 WL 4716027 (5th Cir. Dec. 10, 2009) (unpubl.) ("an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions"); *Ripley v. Chater*, 67 F.3d 552, 557-558 (5th Cir. 1995) (substantial evidence lacking where:   no medical assessment of claimant's residual functional capacity, and claimant's testimony was inconsistent with ALJ's assessment); *Butler v. Barnhart*, Case Number 03-31052 (5th Cir. 06/02/2004) (unpubl.) (in the absence of medical opinion or evidence establishing that the claimant could perform the requisite exertional demands, the ALJ's determination is not supported by substantial evidence).[6]

---

[6] The court focused its analysis upon the insufficiency of the ALJ's assessment of the effects of plaintiff's mental impairments because of the conflicting assessments by plaintiff's treating mental health providers.   While the record does not contain an assessment from a treating provider that addresses the effects of plaintiff's physical impairments (even though plaintiff asked for one, *see* Tr. 300-302), the assessment by the non-examining physician appears to be outdated and based on evidence not in the record.   Upon remand, the ALJ should obtain a medical source statement from plaintiff's treating provider and/or obtain a consultative physical examination, with associated medical source statement.

## II.    Step Five and Remand

Because the foundation for the ALJ's step five determination was premised upon an RFC that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled, likewise is not supported by substantial evidence.[7]

The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.    42 U.S.C. §405(g).    When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.    *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625,

---

[7]    Plaintiff further challenged the ALJ's step five finding because he failed to ask the vocational expert ("VE") whether his testimony was consistent with the Dictionary of Occupational Titles. According to Social Security Ruling 00-4p:

> [w]hen a VE or VS [vocational specialist] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will: Ask the VE or VS if the evidence he or she *has provided* conflicts with information provided in the DOT . . .

TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS (SSR 00-4p) (Dec. 4, 2000) (emphasis added).

Here, however, the ALJ asked the VE, *in advance of his testimony*, whether his testimony was going to be consistent with the DOT.    (Tr. 52).    How does the VE know what he is going to testify to?    Unless the VE knows all of the hypotheticals that are going to be presented to him, the court does not discern a basis for him to predict that his testimony will be consistent with the DOT.    Indeed, SSR 00-4p states that the ALJ should ask the VE whether the testimony he *has provided* conflicts with the DOT.    The ALJ should ensure adherence to SSR 00-4p upon remand.

19

627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits).   The instant record is not so disposed.   Plaintiff's residual functional capacity assessment remains indeterminate.

### Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.[8]

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

---

[8]   The court need not consider plaintiff's additional arguments.   These issues may be addressed upon remand.

20

In Chambers, at Monroe, Louisiana, this 16th day of March 2020.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE